UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ALBERT L. GRAY, Administrator,
et al., Plaintiffs,

v.                              C.A. No. 04-312L

JEFFREY DERDERIAN,
et al., Defendants.


ESTATE OF JUDE B. HENAULT,
et al., Plaintiffs,

v.                              C.A. No. 03-483L

AMERICAN FOAM CORPORATION;
et al., Defendants.


In Re Motion to Dismiss of Defendants Clear Channel Broadcasting,
Inc., and Capstar Radio Operating Company, successor-in-interest
to WHJY, Inc.

### DECISION AND ORDER

Ronald R. Lagueux, Senior District Judge.

On February 20, 2003, a deadly fire destroyed a nightclub in
West Warwick, Rhode Island, known as The Station.  The fire
started as the featured rock band, Great White, began its live
performance and the club was crowded with spectators, staff and
performers.  The opening featured stage fireworks, ignited by the
band's tour manager, as the band took the stage.

According to eyewitnesses, the fireworks created sparks
behind the stage which ignited polyurethane foam insulation on
the club's ceiling and walls.  In minutes, the entire building

was on fire and over 400 people were struggling to escape the crowded, dark and smoky space.  The final toll:  One hundred people dead and over 200 injured.

Numerous lawsuits, both criminal and civil, were filed throughout southern New England in both state and federal courts. Last year, in Passa v. Derderian, 308 F.Supp. 2d 43 (D.R.I. 2004), this Court asserted jurisdiction over several of the civil cases that had been removed here from Rhode Island Superior Court, and asserted jurisdiction as well over the cases that had originally been filed in this Court.  The Court's exercise of original federal jurisdiction is based upon the Multiparty, Multiforum, Trial Jurisdiction Act of 2002, 28 U.S.C. § 1369. Since that time, to the best of this Court's knowledge, all civil lawsuits resulting from the nightclub fire have been consolidated in this Court, pursuant to a First Amended Master Complaint (hereinafter "the Master Complaint") filed and adopted jointly by about 250 plaintiffs, against over 50 defendants.   Although this Court's jurisdiction relies upon federal law, Rhode Island provides the substantive law for these cases.  Erie R.R. v. Tompkins, 304 U.S. 64 (1938); Ticketmaster-New York v. Alioto, 26 F.3d 201, 204 (1st Cir. 1994); Passa v. Derderian,308 F.Supp. 2d 43 (D.R.I. 2004).  As of this writing, discovery has been stayed to permit an adequate time for service of, and response to, the new Master Complaint and for the Court to deal with a number of

-2-

motions to dismiss. To date, the Court has addressed two other motions to dismiss, which may be found under this same caption at 371 F.Supp.2d 98 (D.R.I. 2005) and 365 F.Supp.2d 218 (D.R.I. 2005).

Presently before the Court is the Motion to Dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), brought by Clear Channel Broadcasting, Inc., and its wholly-owned subsidiary Capstar Radio Operating Company. Capstar Radio Operating Company is the successor-in-interest to WHJY, Inc. At the time of the fire, WHJY, Inc., operated radio station WHJY-FM, which was a sponsor of the Great White concert. The corporations will be identified collectively in this opinion as "WHJY" or as Defendants.

Defendants move for the dismissal of the counts asserted against them stemming from WHJY-FM's activities in connection with its sponsorship of the concert. These include allegations of negligence brought by all plaintiffs in the Master Complaint, as well as allegations based on a joint venture theory brought by a small subset of plaintiffs known as the "Henault" Plaintiffs. For the reasons set forth below, the Court denies the Motion to Dismiss the allegations in the Master Complaint, but grants it as to the joint venture allegations.

## Standard of Review

Defendants move to dismiss the claims against them pursuant

-3-

to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief may be granted.   F.R.C.P. Rule 12 (b) states that as to subpart (6), if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."   In connection with the present Motion to Dismiss, Plaintiffs have presented additional material with their memoranda.   However, because discovery has been and remains stayed in this litigation, neither side has had an opportunity to develop a complete record in support of its allegations or defenses.   Consequently, the Court has chosen to exclude all extraneous information and affidavits, as well as all arguments in reliance thereon, in ruling on the present Motion to Dismiss.

At present, the Court adheres to the narrow and limited focus appropriate to a Motion to Dismiss, analyzing only the well-pleaded complaint for allegations necessary to support the claims.   In the course of its analysis, the Court will assume that all allegations are true.   The allegations and all reasonable inferences to be drawn from them will be construed in the light most favorable to the Plaintiffs.   Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996).   As stated by the United States Supreme Court, "the accepted rule [is] that a complaint should

-4-

not be dismissed for failure to state a claim unless it appears
beyond doubt that the plaintiff can prove no set of facts in
support of his claim which would entitle him to relief." Conley
v. Gibson, 355 U.S. 41, 45 - 46 (1957).  Defendants' motion will
fail if "the well-pleaded facts, taken as true, justify recovery
on any supportable legal theory." Cruz v. Melecio, 204 F.3d 14,
21 (1st Cir. 2000).

     The First Circuit has also stated:

> Nevertheless, minimal requirements are not
> tantamount to nonexistent requirements.  The
> threshold may be low, but it is real – and it
> is the plaintiff's burden to take the step
> which brings his case safely into the next
> phase of the litigation.  The court need not
> conjure up unpled allegations or contrive
> elaborately arcane scripts in order to carry
> the blushing bride through the portal.

Gooley v. Mobil Oil Corp., 851 F.2d 513, 514 (1st Cir. 1988).
Gooley holds that the plaintiff is required "to set forth factual
allegations, either direct or inferential, respecting each
material element necessary to sustain recovery under some
actionable legal theory."  851 F.2d at 515.  See also DM Research
v. College of Am. Pathologists, 2 F.Supp. 2d 226, 228 (D.R.I.
1998).

### The Master Complaint

     The Master Complaint, which all plaintiffs have adopted,
sets forth allegations against Defendants in paragraphs 395
through 410.  The Master Complaint alleges that, by January 2003,

WHJY had decided to sponsor the upcoming concert at The Station, and those sponsorship activities included:

* advertising its sponsorship on the radio and in print;

* hanging a banner outside The Station, which invited patrons to "party with WHJY;"

* distributing free tickets to the concert;

* staffing the concert with several of the radio station's interns to help out with the concert and its promotion;

* providing a WHJY disc jockey to serve as master of ceremonies at the concert; and

* meeting with other corporate sponsors to coordinate promotional activities.

Plaintiffs allege that, because its employee and agent Mike Gonsalves was serving as emcee of the concert,[1] WHJY had the authority to stop or delay the performance in the face of concerns over safety or equipment. Furthermore, WHJY was familiar with Great White's music and performance style, and knew or should have known that Great White "had repeatedly, openly and illegally used unlicensed pyrotechnics on its tour on numerous occasions prior to February 20, 2003." Master Complaint, ¶ 399. The Master Complaint continues, "Minimal inquiry by WHJY, Inc. would have disclosed the inherently dangerous nature of the band's performance, a performance which WHJY knew or should have

---

[1] WHJY's disc jockey, Mike Gonsalves, died in the fire.

known would begin with the setting off of illegal pyrotechnics before a proximate audience." Master Complaint, ¶ 399. Plaintiffs further allege that from its special role as sponsor and promoter, combined with its knowledge of the band and its previous performances, WHJY derived a duty of care to The Station's patrons which it negligently breached causing death and personal injury to the Plaintiffs.

In the Master Complaint it is then alleged that Clear Channel Broadcasting exercised direct management control over the radio station's activities and policies, including decisions about sponsorship activities. Therefore, Clear Channel is directly liable for the events in question, and it also derives vicarious liability from its principal-agent relationship with the radio station.

### Negligence

The Plaintiffs have alleged that WHJY, as sponsor of the concert, had a duty to undertake a minimal inquiry into safety conditions and risks posed by the concert. A minimal inquiry would have revealed that Great White had previously set off pyrotechnics during its tour, and raised the possibility that the band intended again to incorporate pyrotechnics into its performance at The Station. As sponsor, WHJY played a role in the planning of the event and so had some control over how the event was carried out. Moreover, WHJY's agent, the master of

ceremonies Mike Gonsalves, had control and authority over the timing and commencement of the concert, but he negligently failed to exercise that control or authority in the face of serious and foreseeable risks.

As this Court has written, to make out a *prima facie* case of negligence under Rhode Island law, Plaintiffs must show that 1) Defendants owed them a legal duty to refrain from negligent activities; 2) Defendants breached that duty; 3) the breach proximately caused Plaintiffs' injuries; and 4) actual loss or damages resulted.  <u>Splendorio v. Bilray Demolition Co.</u>, 682 A.2d 461, 466 (R.I. 1996).

The threshold question that must be addressed is whether WHJY, as sponsor of the concert, owed a duty of due care to the concert attendees.

## Sponsorship liability

The Rhode Island Supreme Court has written that "every negligence case begins with a consideration of whether a legally cognizable duty runs from the defendant to the plaintiff." <u>Kenney Mfg. Co. v. Starkweather & Shepley, Inc.</u>, 643 A.2d 203, 206 (R.I. 1994).  The existence of a duty is a question of law to be determined by the court.  <u>Ferreira v. Strack</u>, 636 A.2d 682, 685 (R.I. 1994).  The Rhode Island Supreme Court in <u>Ferreira</u> noted that there is no "universal test" to determine the existence of a duty, but instead the court should employ "an *ad*

-8-

*hoc* approach of considering all relevant factors." 636 A.2d at 685.

Where there is a claim of sponsorship liability, courts generally review the facts and circumstances to determine if the sponsor had any control over the sponsored event. For example, in Lambert v. Pepsico, Inc., 698 So.2d 1031 (La.App. 4 Cir. 1997), summary judgment was granted in favor of beverage company sponsors after a carnival ride caught on fire, seriously injuring its passengers. In support of their motion, the sponsors proffered written contracts among three co-defendant entities allocating responsibility for the rides and concessions at the fair, as well as liability insurance for same. Consequently, the sponsors were able to demonstrate that they had no custody or control over the rides or their operation. 698 So.2d at 1032.

In O'Sullivan v. Hemisphere Broadcasting Corp., 520 N.E.2d 1301 (Mass. 1988), the Supreme Judicial Court of Massachusetts engaged in a similar analysis. In that case, a radio station and a brewing company sponsored a party at which free beer was distributed. As with the case before this Court, the radio station advertised the event, and some of its on-air personalities were present. One of the attendees became intoxicated, left the party and soon thereafter had a car collision with the plaintiff. Plaintiff alleged that both the radio station and the brewing company failed to supervise the

-9-

distribution of the free beer.   In upholding the lower court's grant of summary judgment in favor of the sponsors, the Supreme Judicial Court wrote, "The fatal weakness in the plaintiff's entire case (both for negligence and for c. 93A violation) is the defendants' total lack of control and right to control the distribution of the free beer."   520 N.E.2d at 1302.

In Vogel v. West Mountain Corp., 97 A.D.2d 46 (N.Y. App. Div. 3d Dep't 1983), the Court addressed the issue of the sponsor's liability for an accident that took place during a ski race advertised as the "Miller [Beer] Ski Club Slalom." Plaintiff lost control and skied into the concrete base of a tower.  She alleged that the sponsor was negligent in failing to warn of the dangers of ski racing, and failing to properly arrange the race course.  The appellate court upheld the lower court's grant of summary judgment in favor of Miller Brewing Company:

> Special Term assumed, *arguendo*, that
> sponsorship by Miller was established and
> concluded that sponsorship alone, absent
> "control over the design of the course, the
> supervision of the race, or the
> qualifications of entrants," was insufficient
> to impose liability for injuries sustained by
> a participant. ... we accept Special Term's
> conclusion that mere sponsorship, absent
> control, does not render Miller legally
> responsible.

97 A.D.2d at 47-48.   See also Zarelli v. Barnum Festival Soc., 505 A.2d 25 (Conn. App. 1986).

This Court has written on the topic of sponsorship liability
in <u>McAleer v. Smith</u>, 860 F.Supp. 924 (D.R.I. 1994).  Although
portions of the case were decided according to Rhode Island law,
the negligence claims were brought under the Death on the High
Seas Act ("DOSHA"), 46 U.S.C. §§ 761-767, and under general
maritime law.  The case resulted from the sinking of 67-year-old
tall ship on the high seas off Bermuda during a sailing race in
June 1984.  Nineteen of the 28 people on board the ship were
drowned.  Ten of the crew were sail trainees recruited by the
American Sail Training Association ("ASTA"), a Rhode Island
corporation which solicited and supervised trainees by placing
them on boats where they could learn sailing technique through
experience.  Prior to this particular race, for which ASTA also
served as one of the organizers, ASTA entered into a contract
with the sailboat owner whereby ASTA would recruit sail trainees
for the race.  The boat owner in turn agreed to follow
comprehensive ASTA maintenance and sailing instructions, to
permit two ASTA sailing counselors on the boat, and to provide an
orderly and safe ship.

The families of two of the drowned trainees sued ASTA, among
other defendants, alleging that ASTA was negligent in inducing
decedents to serve on the boat "'when it knew, or should have
known that the vessel was unsafe, manned by an inadequate and
untrained crew, and unfit to participate' in the sail training

-11-

race." 860 F.Supp. at 930.

ASTA argued that its role was analogous to that of a tour company or travel agency, where courts have generally declined to impose liability for injuries sustained by vacationers. See McElheny v. Trans National Travel, Inc., 165 F.Supp.2d 190 (D.R.I. 2001). During a fifteen-day bench trial, followed by a year-long review of the evidence presented, this Court examined the details of every aspect of the relationship between ASTA and the sail trainees in order to determine whether ASTA exercised control over the selection of the boats where trainees would be placed and over the conduct of the race. The Court found that ASTA matched trainees with boats for particular cruises, provided instruction through its counselors, promoted the boats and the Tall Ships Race, promulgated the race rules and inspected the boat's safety equipment before the race. 860 F.Supp. at 931.

Consequently, the Court concluded that ASTA owed a duty to the sail trainees "to exercise due and reasonable care in choosing and approving vessels for sail training to assure that the sail trainees were placed aboard seaworthy, properly manned and safe vessels. Additionally, ASTA owed a duty to exercise reasonable care in the conduct of the Tall Ships Race so as not to increase the risks inherent in sail training." 860 F.Supp. at 931.

Finally, the Court is compelled to discuss a Rhode Island

-12-

case which demonstrates pertinent legal principles, but is also significant because it involves fireworks, <u>Sroka v. Halliday</u>, 39 R.I. 119 (1916).  The injury occurred when a little boy found and detonated an unexploded aerial bomb that had landed in his yard during a Fourth of July fireworks display put on by the City of Pawtucket.  Defendants were a group of citizens who had formed a Fourth of July Committee to arrange this entertainment. Plaintiffs appealed after the Superior Court directed a verdict in favor of the defendants.  Evidence presented at the trial showed that the Committee entered into a contract with a fireworks company to furnish the fireworks "in a manner satisfactory to said Fourth of July Committee."  39 R.I. at 125. From this phrase, the Rhode Island Supreme Court concluded that the Fourth of July Committee had not relinquished control over the fireworks display to the fireworks company.

> ... this clause then applies to everything to
> be done, not only to the quality and extent
> of the exhibit; but also to the manner of
> doing the firing; and it seems to us to be
> unwarranted to say that under this language
> the committee or any member thereof did not
> have full authority to control the "manner"
> of doing anything which had to be done.  If
> it had been observed in any portion of this
> display during the day or evening that the
> bombs or other fireworks were being
> discharged in such a manner as to be
> dangerous to property or to persons, or so as
> to show that the man engaged in the work of
> firing was incompetent, reckless or
> negligent, it would have been not only the
> right but the duty of the committee or any
> member thereof, or of the sub-committee or

> any member thereof, to have stopped the
> firing and either to have forbidden the
> continuance of the display entirely, or to
> have insisted that the incompetent, reckless
> or negligent person in charge should be
> removed, and that a man or men competent for
> the work should be substituted.  We are of
> the opinion that by the terms of the contract
> itself the "manner" of the doing the work was
> subject at all times to the full control of
> the defendants...

39 R.I. at 132.  The Supreme Court went on to point out that even
if the fireworks company were deemed an independent contractor,
as the trial judge had determined, the Fourth of July Committee
would not be relieved of liability.  Although in most situations
one who contracts with an independent contractor is not liable
for the independent contractor's negligence, "there is a notable
and important exception to this doctrine where the contract calls
for the doing of things which are in their very nature liable,
unless precautions are taken, to do injury to others.  In these
latter cases a duty arises on the part of the contractee to see
to it that these precautions are taken ..." 39 R.I. at 133.  The
Sroka Court proceeds to catalog fireworks cases from across the
nation, underscoring for the reader the extreme danger posed by
fireworks and the extraordinary precautions required of everyone
connected to their display.  39 R.I. at 133 - 141.

Turning now to the allegations found in the Master
Complaint, Plaintiffs allege that Defendants exercised control
over the concert in the following areas:

- deciding whether or not to sponsor the concert;

- soliciting attendance through promotion, advertising and the distribution of free tickets;

- coordinating promotional activities with the other sponsors before and during the concert;

- providing radio station interns to be present at The Station during the concert; and

- providing disc jockey Mike Gonsalves to serve as master of ceremonies, introduce the band and essentially run the show. Plaintiffs allege that Mike Gonsalves, as master of ceremonies, had "the authority and opportunity to stop or delay Great White's performance over any issue relating to safety or equipment." Master Complaint, ¶ 398.

These allegations support the reasonable inferences that WHJY discussed the concert with The Station ahead of time, that WHJY had the opportunity to set down some conditions or guidelines before it agreed to sponsor the concert, and that WHJY had an agreement with The Station and the other sponsors about which group would handle which duties before and during the concert.  Most significantly, Mike Gonsalves, as master of ceremonies, was on the stage, presumably aware of the plans to set off the fireworks, and certainly appears to have had the opportunity to delay the concert in order to investigate the propriety of those plans.  Plaintiffs' allegations, if proven,

-15-

and the inferences drawn therefrom indicate that WHJY had some measure of control over the events of the evening of February 20, 2003.

Following the lead of the cases outlined above, the Court determines that, to the extent that Plaintiffs can establish that WHJY had control over the planning and operation of the concert, then the Court can find that WHJY owed a duty, commensurate with its measure of control, to the Plaintiffs. That duty, if proven to exist, may have been breached when WHJY failed to take any steps to prevent the ignition of the fireworks inside the small and crowded nightclub.

### Red herrings

In Paragraph 400 of the Master Complaint, Plaintiffs allege that WHJY owed a duty to Plaintiffs to make a minimal inquiry concerning the safety of the band's performance. The Master Complaint continues, "Additionally, WHJY, Inc.'s allowing use of the trademark or servicemark, 'WHJY' without making such minimal inquiry into the quality or safety of the product or services associated with it constituted naked licensing of the mark which deceived, or tended to deceive, the public, including Plaintiffs." ¶ 400. Plaintiffs have imported the notion of "naked licensing" from federal trademark law, 15 U.S.C. §§ 1051 et seq. In that context, a trademark owner who permits licensees to produce goods under his mark has a duty to control the quality

-16-

of those goods in order to protect consumers.   See <u>Jordan K.</u>
<u>Rand, Ltd. v. Lazoff Bros.</u>, Inc., 537 F.Supp. 587 (D.P.R. 1982),
<u>Arthur Murray, Inc. v. Horst</u>, 110 F.Supp. 678 (D. Mass. 1953).
This legal principle has no bearing whatsoever on Plaintiffs'
claims of negligence against WHJY.

On the other side of the aisle, Defendants have invoked a
constitutional argument in their effort to defeat Plaintiffs'
claims.   Defendants note, correctly, that Plaintiffs have
included in their allegations that Defendants advertised the
concert in print and on the radio, met with others who were
promoting the concert and hung a banner inviting the public to
the concert.   "Liability for these types of speech-related
activity," Defendants note in their memorandum, "however, is
proscribed by the First Amendment to the United States
Constitution."   This Court does not understand Plaintiffs to be
alleging that Defendants' liability stems from these activities;
rather, Plaintiffs include these alleged facts in order to
demonstrate Defendants' control over events before and during the
concert, the nexus between Defendants' conduct and Plaintiffs'
injuries, and other factors necessary to support their claims of
negligence.   The Court does not believe it will be useful for
Defendants to further pursue a defense based on the First
Amendment.

## The Henault allegations

A small subset of plaintiffs from Connecticut adopted the Master Complaint but have also filed additional allegations under the case caption Estate of Jude B. Henault, et al., v. American Foam Corporation, C.A. No. 03-483-L.  Count Ten of the Henault Plaintiffs' Notice of Adoption of the First Amended Master Complaint (hereinafter "Notice of Adoption") charges that Clear Channel Broadcasting, Inc., d/b/a WHJY-FM, along with several other defendants[2] entered into a joint venture in the pursuit of economic gain and their common business interests.  The joint venture consisted of "an express or implied agreement for the common purpose and design of planning, endorsing, sponsoring, promoting, and/or advertising the concert."  Notice of Adoption, ¶ 67.

It is alleged that each of the parties to the joint venture controlled certain aspects of the concert, and all had a "right to voice concerns regarding the event."  Notice of Adoption, ¶ 69.  All parties to the joint venture owed a duty to Plaintiffs, and all are liable for the negligent acts or omissions that

---

[2]The other defendants included in the joint venture are:
Jeffrey Derderian; Michael Derderian; DERCO, LLC d/b/a The
Station; Manic Music Management, Inc., Jack Russell; Mark
Kendall; David Filice; Eric Powers; Daniel Biechele; Paul
Woolnough; Knight Records, Inc.; Anheuser-Busch, Inc.; Anheuser-
Busch Companies, Inc.; McLaughlin & Moran, Inc.; Citadel
Communications Corporation d/b/a WQGN-FM; Motiva Enterprises,
LLC; Shell Oil Company, Town of West Warwick, Dennis Larocque;
State of Rhode Island; and Irving J. Owens.

proximately caused their injuries.

### Joint venture

Under Rhode Island law, a joint venture is "an undertaking by two or more persons jointly to carry out a single business enterprise for profit." Fireman's Fund Ins. Co. v. E. W. Burman, Inc., 391 A.2d 99, 101 (R.I. 1978).  In McAleer, this Court wrote,

> Generally, in order for a joint venture to
> exist, the parties must be bound by express
> or implied contract, providing for: (1) a
> community of interests, and (2) joint or
> mutual control, that is, an equal right to
> direct and govern the undertaking.  In
> addition, the joint venture agreement must
> provide for a sharing of losses as well as
> profits.

860 F.Supp. 924 at 943.  When a joint venture is established, then all members of the joint venture are chargeable with the negligence of one member acting in furtherance of the joint enterprise.  Walsh v. Israel Couture Post, No. 2274 V.F.W., 542 A.2d 1094, 1096 (R.I. 1988).

A review of the joint venture allegations in the Notice of Adoption reveals few of the requisite elements.  The alleged joint venturers, twenty-five in number, include the owners of the nightclub, the band members and road manager, the corporate sponsors, the Town of West Warwick and its fire inspector, the State of Rhode Island and its fire marshal, and two California corporations which the Court believes may comprise the band's

promoter and/or recording company.   According to Count Ten, these parties entered into "an express or implied agreement for the common purpose and design of planning, endorsing, sponsoring, promoting, and/or advertising the concert" in order to pursue common business interests and economic gain.   Notice of Adoption, ¶¶ 67 - 68.   The Henault Plaintiffs also allege that each joint venturer could "voice concerns regarding the event" and that each controlled "certain aspects of the planning, endorsement, sponsorship, promotion, and/or advertising relating to the Great White concert."   Notice of Adoption, ¶ 69.

While it may be true that at least some of the joint venture Defendants collaborated to put on the Great White concert, Plaintiffs fail to make the essential allegation that they had an agreement to share profits and losses.   The Court has tried, in the words of Circuit Chief Judge Boudin, "indulging to a reasonable degree a plaintiff who has not yet had an opportunity to conduct discovery."   DM Research, Inc. v. College of Am. Pathologists, 170 F.3d 53, 55 (1st Cir. 1999).   However, despite all indulgent inferences, the Court is unable to imagine what kind of an agreement could include the State of Rhode Island, the fire marshal, the Town of West Warwick and the fire inspector. Even between the nightclub owners and the band, the Court opines that the usual arrangement is for the band to receive a set fee for performing and the nightclub to receive revenues from ticket

and refreshment sales.   This assumption is not contradicted by any allegation describing a different sort of arrangement which would include the sharing of profits and losses.   Similarly, the Court conjectures that corporate sponsors would generally not receive a share of the profits, but instead would enjoy the benefits of publicity.   Again, there is no allegation that the arrangement was otherwise in this instance.   Plaintiffs allege that the town and state officials failed to adequately inspect The Station for fire and other safety hazards.   There is no allegation that the state and town officials had an agreement to share in the profits and losses from the concert, or, that they played any role in putting on the concert.

For all these reasons, the Court concludes that the Henault Plaintiffs have failed to allege adequate factual predicates to support their claim.   Even if all the allegations are taken as true, a joint venture has not been sufficiently pleaded. Consequently, Count Ten of the Notice of Adoption in the Henault case is dismissed as to these moving Defendants.   The handwriting is on the wall for all the other defendants accused of being joint venturers.

### Conclusion

For the aforementioned reasons, this Court denies the WHJY Defendants' Motion to Dismiss the allegations set forth in the First Amended Master Complaint, but grants the WHJY Defendants'

Motion to Dismiss Count Ten of the Notice of Adoption of First Amended Master Complaint in the Henault case.  No judgment shall enter at this time.

It is so ordered.


Ronald R. Lagueux
Senior United States District Judge
September 22 , 2005