UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ALBERT L. GRAY, Administrator, et al.,  :
                          Plaintiffs,   :
                                        :
            vs.                         :      CA 04-312L
                                        :
JEFFREY DERDERIAN, et al.,              :
                          Defendants.   :


ESTATE OF JUDE B. HENAULT, et al.,      :
                          Plaintiffs,   :
                                        :
            vs.                         :      CA 03-483L
                                        :
AMERICAN FOAM CORPORATION, et al.,      :
                          Defendants.   :


### REPORT AND RECOMMENDATION

### RE SEVEN DEFENDANTS' MOTIONS TO APPROVE SETTLEMENTS

David L. Martin, United States Magistrate Judge

     Before the Court are seven additional motions[1] to approve

settlements which individual Defendants have reached with all

Plaintiffs in all cases arising out of the Station Nightclub

-----

     [1] The Court has previously granted twelve motions filed by
multiple defendants to approve settlements. See Memorandum and Order
Re: Report and Recommendation – Twelve Defendants' Motions to Approve
Settlements Dated May 22, 2009 (Gray Doc. #2011)(Henault Doc. #1147).
The Court has also previously granted one motion filed by Plaintiffs
to approve a settlement. See Memorandum and Order Re: Report and
Recommendation – Plaintiffs' Motion to Approve Settlement with West
Warwick Defendants – Dated May 22, 2009 (Gray Doc. #2010)(Henault Doc.
#1146).

Fire:[2]

    1.  McLaughlin & Moran, Inc's Motion to Approve "Good Faith" Settlement in Accordance with Rhode Island General Laws §§ 10-6-7 and 10-6-8 (<u>Gray</u> Doc. #1993)(<u>Henault</u> Doc. #1128) ("McLaughlin & Moran's Motion");

    2.  Luna Tech, Inc.'s Motion to Approve "Good Faith" Settlement in Accordance with Rhode Island General Laws §§ 10-6-7 and 10-6-8 (<u>Gray</u> Doc. #2000) ("LTI's Motion");[3]

    3.  Motion to Approve Settlement by Defendants Jack Russell, Jack Russell Touring, Inc., Paul Woolnough, Manic Music Management, Inc., Knight Records, Inc., Mark Kendall, David Filice and Eric Powers (<u>Gray</u> Doc. #2001)(<u>Henault</u> Doc. #1136) ("Jack Russell Defendants' Motion");

---

[2] The Station Nightclub Fire cases are: <u>Gray, et al. v. Derderian, et al.</u>, C.A. No. 04-312L; <u>Estate of Henault, et al. v. American Foam Corp., et al.</u>, C.A. No. 03-483L; <u>Passa, et al. v. Derderian, et al.</u>, C.A. No. 03-148L; <u>Kingsley, et al. v. Derderian, et al.</u>, C.A. No. 03-208L; <u>Guindon, et al. v. American Foam Corp., et al.</u>, C.A. No. 03-335L; <u>Roderiques, et al. v. American Foam Corp., et al.</u>, C.A. No. 04-026L; <u>Sweet, et al. v. American Foam Corp., et al.</u>, C.A. No. 04-056L; <u>Paskowski, et al. v. Derderian, et al.</u>, C.A. No. 05-002L; <u>Kolasa v. American Foam Corp., et al.</u>, C.A. No. 05-070L; <u>Malagrino v. American Foam Corp., et al.</u>, C.A. No. 06-002L; <u>Long v. American Foam Corp., et al.</u>, C.A. No. 06-047L; <u>Gonsalves v. Derderian, et al.</u>, C.A. No. 06-076L; and <u>Napolitano, et al. v. Derderian, et al.</u>, C.A. No. 06-080L. (Note: <u>Guindon, et al. v. Leggett & Platt, Inc., et al.</u>, C.A. No. 07-366L, was consolidated with <u>Guindon, et al. v. American Foam Corp., et al.</u>, C.A. No. 03-335L. <u>See</u> Order Granting Plaintiffs' Motion to Consolidate (Doc. #7 in C.A. No. 07-366L).)

[3] Luna Tech, Inc., filed a corrected motion in the <u>Henault</u> case. <u>See</u> Luna Tech, Inc.'s Corrected Motion to Approve "Good Faith" Settlement in Accordance with Rhode Island General Laws §§ 10-6-7 and 10-6-8 (<u>Henault</u> Doc. #1143) ("LTI's Corrected Motion"). The Court treats the original motion and LTI's Corrected Motion as one motion. The only substantive difference between the two motions is that in the memorandum and affidavit filed in support of LTI's Corrected Motion the date referenced for filing the Notice of Settlement "has been changed to reflect the accurate date of June 2, 2009[,] for the filing of that document in [the <u>Henault</u>] case." LTI's Corrected Motion at 1 n.1; <u>see also</u> Corrected Memorandum of Law in Support of Luna Tech, Inc.'s Motion to Approve "Good Faith" Settlement in Accordance with Rhode Island General Laws §§ 10-6-7 and 10-6-8 ("LTI's Corrected Mem.") at 1 n.1.

4.   LIN Television Defendants'[1] Motion to Approve "Good Faith" Settlement Pursuant to R.I.G.L. §§ 10-6-7 and 10-6-8 (<u>Gray</u> Doc. #2003)(<u>Henault</u> Doc. #1138) ("LIN Television Defendants' Motion");

5.   Motion to Approve Settlement by Defendant Daniel Biechele (<u>Gray</u> Doc. #2004)(<u>Henault</u> Doc. #1139) ("Biechele's Motion");

6.   Motion of the Defendants, Jeffrey Derderian, Michael Derderian, and DERCO, LLC, to Approve the Settlement (<u>Gray</u> Doc. #2009)(<u>Henault</u> Doc. #1145) ("DERCO Defendants' Motion"); and

7.   Defendant, High Tech Special Effects, Inc.'s Motion to Approve "Good Faith" Settlement under R.I.G.L. §§ 10-6-7 and 10-6-8 (<u>Gray</u> Doc. #2013)(<u>Henault</u> Doc. #1149) ("High Tech's Motion").

Collectively, the motions are referred to as the "Motions" and the parties filing the Motions as the "Movants."  The Motions have been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  No objections have been filed to the Motions, and the Court has determined that no hearing is necessary.  For the reasons stated herein, I recommend that the Motions be granted.

## Background

The facts giving rise to these actions have been concisely stated by Senior Judge Ronald R. Lagueux and are reproduced below:

On February 20, 2003, a deadly fire in West Warwick, Rhode Island, destroyed a nightclub known as the Station. The fire started as the featured rock band, Great White, began its live performance and the club was crowded with spectators, staff and performers.  The concert featured stage fireworks, ignited by the band's tour manager as

the band took the stage.

According to eyewitnesses, the fireworks created sparks behind the stage which ignited foam insulation materials on the club's ceiling and walls.  In minutes, the entire building was on fire and over 400 people were struggling to escape the crowded, dark and smoky space.  One hundred people died and over 200 others were injured as a result of the fire.

Numerous lawsuits, both criminal and civil, were filed throughout southern New England in both state and federal courts.  The civil lawsuits have been consolidated in this Court, which asserted its original federal jurisdiction based on the Multiparty, Multiforum Trial Jurisdiction Act of 2002, 28 U.S.C. § 1369.  See Passa v. Derderian, 308 F.Supp.2d 43 (D.R.I. 2004).

Gray v. Derderian, 472 F.Supp.2d 172, 175 (D.R.I. 2007).


## Overview

All Defendants in the lawsuits arising out of the fire have

reached settlements in principle with all Plaintiffs.  See

Memorandum of Law by the "Triton Defendants"[4] in Support of

Motion to Approve "Good Faith" Settlement in Accordance with

R.I.G.L. §§ 10-6-7, 10-6-8 ("Triton Mem.") at 1 n.1.[5]  By the

instant Motions, Movants seeks an order finding that the

---

[4] The Triton Defendants are: Triton Realty Limited Partnership; Triton Realty, Inc.; Raymond J. Villanova; Frances A. Villanova; Framingham-150 FR Realty Limited Partnership by Framingham-150 FR Realty, Inc., its General Partner; and Seekonk-226 Limited Partnership by Seekonk-226, Inc., its General Partner.  See Triton Defendants' Motion at 1 n.1.

[5] The Triton Mem. was filed in support of the Motion to Approve "Good Faith" Settlement in Accordance with R.I.G.L. §§ 10-6-7, 10-6-8 on behalf of the "Triton Defendants" (Gray Doc. #1944)(Henault Doc. #1091) ("Triton Defendants' Motion").  The memorandum can be readily accessed through the Court's Electronic Case Filing system.

settlement which each Movant has reached with the Plaintiffs constitutes a "good faith settlement" under R.I. Gen. Laws §§ 10-6-7 and 10-6-8.[6] Such a finding is necessary to extinguish all

---

[6] The two statutes are reproduced below:

10-6-7. Effect of release of one tortfeasor on liability of others. — A release by the injured person of one joint tortfeasor, whether before or after judgment, does not discharge the other tortfeasors unless the release so provides; but reduces the claim against the other tort-feasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

However, in circumstances where there are twenty-five (25) or more deaths from a single occurrence, then a release by the injured person of one joint tortfeasor given as part of a judicially approved **good-faith settlement**, whether before or after judgment, does not discharge the other tortfeasors unless the release so provides but reduces the claim against the other tortfeasors in the amount of the consideration paid for the release.

R.I. Gen. Laws § 10-6-7 (bold added).

10-6-8. Liability to contribution of tortfeasor released by injured person. – A release by the injured person of one joint tortfeasor does not relieve him or her from liability to make contribution to another joint tortfeasor unless the release is given before the right of the other tortfeasor to secure a money judgment for contribution has accrued, and provides for a reduction, to the extent of the pro rata share of the released tortfeasor, of the injured person's damages recoverable against all the other tortfeasors.

However, in circumstances where there are twenty-five (25) or more deaths from a single occurrence, a release by the injured person of one joint tortfeasor given as part of a judicially approved **good-faith settlement** does not relieve him or her from liability to make contribution to another joint tortfeasor unless the release is given before the right of the other tortfeasor to secure a money judgment for contribution has accrued, and provides for a reduction to the extent of the amount of the consideration paid for the release.

potential contribution claims by joint tortfeasors against the
Movants once the requisite releases have been executed.

### Standard of Review

In a helpful and well-reasoned memorandum, the Triton
Defendants argue that the standard for determining whether a
settlement is a "good faith settlement" under R.I. Gen. Laws §
10-6-7 and § 10-6-8 is the non-collusive,[7] non-tortious
standard.[8]  See Triton Mem. at 1-22.  They argue that the other

---

R.I. Gen. Laws § 10-6-8 (bold added)

[7] The collusion proscribed by the good faith standard occurs when
the arm's length negotiation between plaintiff and settling tortfeasor
breaks down.  Dacotah Marketing & Research, L.L.C. v. Versatility,
Inc., 21 F.Supp.2d 570, 578 (E.D. Va. 1998).  As the Dacotah Marketing
court explained:

> If the plaintiff no longer seeks to gain as much as possible
> through settlement, but is otherwise motivated, the
> nonsettling defendant is left exposed, his interests
> unprotected in a transaction that may significantly affect
> those interests.  Collusion in violation of [Virginia's "good
> faith" settlement statute] occurs when the release is given
> with the tortious purpose of intentionally injuring the
> interests of nonsettling parties, rather than as the product
> of arm's length bargaining based on the facts of the case and
> the merits of the claim.  When settlement ceases to be the
> result of a bargain at arm's length, it is no longer a "good
> faith" settlement.

Id. (footnotes omitted).

[8] The Court also acknowledges the helpfulness of the memorandum
filed by the Clear Channel Defendants in support of their motion.  See
Memorandum of Law in Support of the Clear Channel Defendants'[1] Motion
to Approve "Good Faith" Settlement in Accordance with Rhode Island
General Laws §§ 10-6-7 and 10-6-8 ("Clear Channel Mem."); see also The
Clear Channel Defendants'[1] Motion to Approve "Good Faith" Settlement in
Accordance with Rhode Island General Laws §§ 10-6-7 and 10-6-8 (Gray
Doc. #1960)(Henault Doc. #1100) ("Clear Channel Defendants' Motion").

two standards, i.e., the "proportionate liability" standard

formulated by the California Supreme Court in Tech-Bilt, Inc. v.

Woodward-Clyde & Assocs., 698 P.2d 159 (Cal. 1985),[9] and the

"totality of the circumstances" standard employed by the court in

Troyer v. Adams, 77 P.3d 83, 83-99 (Haw. 2003), are

inapplicable.[10]

The memorandum provides an informative discussion of the

purpose of the 2006 amendments to the Rhode Island Contribution

Among Tortfeasors Act ("RICATA"), and the Court reproduces that

---

The Clear Channel Defendants are Capstar Radio Operating Company, as
successor-in-interest to WHJY, Inc., formerly a Rhode Island
corporation that operated WHJY-FM (collectively "WHJY"), and Clear
Channel Broadcasting, Inc. ("CCB").  Clear Channel Defendants' Motion
at 1.

[9] The Tech-Bilt majority opinion has been widely criticized.  See
Troyer v. Adams, 77 P.3d 83, 104-05 (Haw. 2003)(citing and discussing
cases); id. at 105 ("[W]e are not aware of any state jurisdiction,
other than California, that has adopted the Tech-Bilt standard in
whole ...."); Miller v. Riverwood Recreation Ctr., Inc., 546 N.W.2d
684, 688 (Mich. Ct. App. 1996)(disagreeing with Tech-Bilt majority and
listing other courts which have also rejected its approach); see also
Copper Mountain, Inc. v. Poma of America, Inc., 890 P.2d 100, 108
(Colo. 1995)(declining to adopt the "reasonable range" test set forth
in Tech-Bilt because of "the intent of the legislature and the
important public policy in favor of settlement of disputes").

[10] The key difference between the "totality of the circumstances"
standard and the "proportionate liability" standard is

>the role of the settling defendant's unknown proportionate
>liability.  Under the proportionate liability standard the
>trial court must consider that element, while under the
>"totality of [the] circumstances" approach the trial justice
>has the discretion to consider it or not, depending upon his
>or her evaluation of the other circumstances known at the time
>of the settlement.

Triton Mem. at 19.

7

discussion below:

On July 3, 2006, sections 10-6-7 and 10-6-8 of Rhode Island's Contribution Among Tortfeasors Act were amended to address a limited group of tort actions – single occurrence mass torts resulting in 25 or more deaths. See P.L. 2006, ch. 213, sec. 2.  Section 10-6-7 was amended by the addition of the following paragraph:

> ... in circumstances where there are twenty-five (25) or more deaths from a single occurrence, then a release by the injured person of one joint tortfeasor given as part of a **judicially approved good-faith settlement**, whether before or after judgment, does not discharge the other tortfeasors unless the release so provides **but reduces the claim against the other tortfeasors in the amount of the consideration paid for the release.**

(Emphasis added).  Section 10-6-8 was amended to provide:

> However, in circumstances where there are twenty-five (25) or more deaths from a single occurrence, a release by the injured person of one joint tortfeasor given as part of a **judicially approved good-faith settlement** does not relieve him or her from liability to make contribution to another joint tortfeasor unless the release is given before the right of the other tortfeasor to secure a money judgment for contribution has accrued, and **provides for a reduction to the extent of the amount of the consideration paid for the release.**

(Emphasis added).

Where there is a good faith pre-trial settlement in a single occurrence mass tort the 2006 amendments eliminate the statutory right of set-off based on proportionate liability, and the statutory right of contribution it represents.  The amendment effectively restores common law principles to this class of mass torts, which means that, if the settlement is in "good faith" the remaining defendants' rights to contribution from a settling defendant are extinguished, and any judgment rendered against a remaining defendant will be

reduced only by the dollar amount of the settlement – regardless of what the settling tortfeasor's percentage of fault for the tort might be.  This mechanism serves to facilitate and encourage settlement in single occurrence mass torts, because if the amount of the settlement is less than the settling defendant's proportionate share of the damages award, the plaintiff no longer bears the risk of such a settlement – the defendants who choose not to settle do.  Since plaintiffs have less risk in settling, and defendants have more risk in not settling, the amendments create a stronger incentive for settlement agreements to be reached in single accident mass torts than exists under the general statutory contribution scheme for all other torts.  The amendments did so by removing proportionate liability as a determining factor from the statutory scheme.

Triton Mem. at 9-10.

After explaining the purpose of the 2006 amendments, the memorandum argues persuasively that the non-collusive, non-tortious standard is the only standard consistent with the concept of "good faith" envisioned by the amendments:

Although the 2006 amendments to Rhode Island's Contribution Among Tortfeasors Act do not define what constitutes a "good faith" settlement, it is apparent that the proportionate liability of the settling defendant was not intended to play a role, or at least not a decisive role, in evaluating whether the settlement was reached in good faith.

Three things are clear about the Act.  First, the proportionate liability of multiple defendants was an essential and integral component of the pre-2006 Act, notwithstanding the fact it placed the risk of pretrial settlements on the injured party.  Second, the 2006 amendments explicitly eliminated proportionate liability as a consideration in single occurrence mass torts resulting in the deaths of 25 or more people in order to encourage and facilitate settlements. Third, encouraging and facilitating pre-trial settlements in single occurrence mass torts was the *raison d'être* for the 2006 amendments.

9

The non-collusive, non-tortious standard for evaluating whether a settlement is in good faith is the only standard in which the defendant's proportionate liability is not a factor.  It would be incongruous to conclude that, while the 2006 amendments expressly removed the proportionate liability requirement from §10-6-7 and §10-6-8 to encourage pre-trial settlements in single occurrence mass torts, the General Assembly simultaneously intended to silently restore proportionate liability as a component in the good faith analysis of a settlement, and reintroduce that impediment.  Reading proportionate liability into the 2006 amendments — by applying the "proportionate liability" or "totality of the circumstances" standards for good faith — after it had been expressly removed, would frustrate, if not negate, the entire purpose of the amendments.  It is virtually certain that the Rhode Island Supreme Court, which "makes every effort to effectuate the legislative intent, while avoiding construing a statute to reach an absurd result[,]" Bucki v. Hawkins, 914 A.2d 491, 497 (R.I. 2007), or frustrate the plain intent of a statute, Matter of Falstaff Brewing Corp., 637 A.2d 1047, 1050 (R.I. 1994), would reject the proportionate liability test, and would not approve a totality of [the] circumstances test in which proportionate liability played a role of any significance.

The history, purpose and terms of the 2006 amendments convincingly demonstrate that the "non-collusive, non-tortious" good faith standard is the only standard consistent with the concept of "good faith" envisioned by the 2006 amendments.  Therefore, notwithstanding the amount of a settlement and any speculation concerning the settling defendant's proportionate share of fault, in the absence of collusion, fraud, dishonesty, or some other wrongful or tortious conduct intended to prejudice the remaining defendants, a pre-trial settlement in a single occurrence mass tort must be approved by the Court, thereby extinguishing any potential liability for contribution from the settling defendant to the remaining defendants.

Id. at 21-22 (first alteration in original).

In view of the purpose of the 2006 amendments to the RICATA

and Rhode Island's strong policy favoring the settlement of

controversies in lieu of litigation, <u>Ryan v. Roman Catholic</u>
<u>Bishop of Providence</u>, 941 A.2d 174, 186 (R.I. 2008); <u>Skaling v.</u>
<u>Aetna Ins. Co.</u>, 799 A.2d 997, 1012 (R.I. 2002), this Court finds
that the applicable standard is the non-collusive, non-tortious
standard, <u>see</u> <u>Noyes v. Raymond</u>, 548 N.E.2d 196, 200 (Mass. App.
Ct. 1990)(finding no basis for denying discharge to a settling
defendant absent suggestion that the settlement was collusive or
otherwise wrongful); <u>see also</u> <u>Miller v. Riverwood Recreation</u>
<u>Ctr., Inc.</u>, 546 N.W.2d 684, 688-89 (Mich. Ct. App. 1996)(finding
that the <u>Tech-Bilt</u> approach would severely undermine the
settlement goal of the Michigan statute and concluding that "good
faith" should be analyzed with respect to the settling parties'
negotiations and intent); <u>Copper Mountain, Inc. v. Poma of</u>
<u>America, Inc.</u>, 890 P.2d 100, 108 (Colo. 1995)(holding that under
Colorado version of Uniform Contribution Among Tort-feasors Act
"a settlement is reached in good faith in the absence of
collusive conduct").

## Burden of Proof

The party relying upon a settlement in seeking to be
discharged has the initial burden of establishing that a
settlement has been agreed upon and its nature and terms.  <u>Noyes</u>
<u>v. Raymond</u>, 548 N.E.2d at 200; <u>accord</u> <u>United States v. Dynamics</u>
<u>Research Corp.</u>, 441 F.Supp.2d 259, 268 (D. Mass. 2006).  The

burden then shifts back to the other party which is required to raise a legitimate issue of good faith. <u>United States v. Dynamics Research Corp.</u>, 441 F.Supp.2d at 268; <u>Copper Mountain, Inc. v. Poma of America, Inc.</u>, 890 P.2d at 108 ("it is the burden of the party challenging the agreement to prove that the agreement was collusive"); <u>see also</u> <u>Noyes v. Raymond</u>, 548 N.E.2d at 200 ("Consistent with the statute's policy of encouraging settlements, ... the burden of coming forward with some showing of lack of good faith ought to rest, we think, with those opposing the discharge."). "If the non-settling party can raise a legitimate issue of good faith then it is entitled to an evidentiary hearing, but such hearings should be the exception given the statute's goal of encouraging settlement." <u>United States v. Dynamics Research Corp.</u>, 441 F.Supp.2d at 269. Thus, there is a presumption that the settlement has been made in good faith, and the burden is on the challenging party to show that the settlement is infected with collusion or other tortious or wrongful conduct. <u>Dacotah Marketing & Research, L.L.C. v. Versatility, Inc.</u>, 21 F.Supp.2d 570, 578 (E.D. Va. 1998); <u>see also</u> <u>Barmat v. John & Jane Doe Partners</u>, 797 P.2d 1223, 1228 (Ariz. Ct. App. 1990)("We do not assume that parties to an agreement acted collusively. We presume that they acted in good faith and require the challenging party to prove a lack thereof.").

**Discussion**

**1.  McLaughlin & Moran's Motion**

By this motion, McLaughlin & Moran seeks an order approving its settlement with all Plaintiffs in the amount of $16,000,000 (sixteen million dollars) as a "good faith" settlement pursuant to R.I. Gen. Laws §§ 10-6-7 and 10-6-8.  <u>See</u> McLaughlin & Moran's Motion at 1.  In support of its contention that the settlement agreement has been reached in good faith, McLaughlin & Moran represents that:

> The settlement agreement reached between McLaughlin & Moran and the Plaintiffs resulted from negotiations between counsel for the parties, each in pursuit of their client's interests.  These negotiations culminated on May 23, 2008[,] in the parties' filing of a Notice of Settlement with this Court.  Affidavit of Howard Merten attached hereto as <u>Exhibit A</u>, ¶ 2.[11]   In that Notice, the parties announced their intent to settle, conditioned on (among other things) this Court's approval of the settlement agreement.  *See* Notice of Settlement – McLaughlin & Moran, Inc. [*Gray* Doc. No. 1777], at 2.  The agreed settlement amount is $16,000,000.

> The negotiations leading to this settlement were [at] arms length, with all parties represented by counsel and with due consideration by the parties of the arguments raised by McLaughlin & Moran in its motion for summary judgment, as well as the costs of protracted litigation, the potential risks and rewards of proceeding to trial, McLaughlin & Moran's resources, and the pressing financial needs of at least some of the

---

[11] The Affidavit of Howard Merten is attached as Exhibit A to the Memorandum of Law in Support of McLaughlin & Moran, Inc.'s Motion to Approve Good Faith Settlement in Accordance with Rhode Island General Laws §§ 10-6-7 and 10-6-8 ("McLaughlin & Moran Mem.").  The McLaughlin and Moran Mem. is filed in support of McLaughlin & Moran's Motion (<u>Gray</u> Doc. #1993)(<u>Henault</u> Doc. #1128).

> plaintiffs.   Exhibit A, ¶ 3.   McLaughlin & Moran and
> plaintiffs' counsel did not agree to any settlement terms
> intended to tortiously or wrongfully injure any non-
> settling defendants.   *Id.*   Indeed, plaintiffs have
> reached settlements in principle with all of the other
> defendants that in general include the same non-financial
> conditions found in the agreement with McLaughlin and
> Moran.   *Id.*   This further demonstrates that McLaughlin &
> Moran's settlement was negotiated at arms length and does
> not wrongfully prejudice any other party to the
> litigation.

Memorandum of Law in Support of McLaughlin & Moran, Inc.'s Motion
to Approve "Good Faith" Settlement in Accordance with Rhode
Island General Laws §§ 10-6-7 and 10-6-8 ("McLaughlin & Moran's
Mem.") at 6 (third alteration in original).

    Based on the above representation and the information
contained in the Affidavit of Howard Merten ("Merten Aff."), I
find that the agreement between McLaughlin & Moran and Plaintiffs
to settle all claims for the gross amount of $16,000,000 (sixteen
million dollars) is a non-collusive agreement which has been
negotiated, bargained for, and agreed to at arm's length and in
good faith.   Thus, the settlement satisfies the standard for "a
judicially approved good-faith settlement" within the meaning of
R.I. Gen. Laws §§ 10-6-7 and 10-6-8.   Accordingly, I recommend
that McLaughlin & Moran's Motion be granted and that any
potential contribution claims against McLaughlin & Moran be
extinguished with prejudice pursuant to these statutory sections.

## 2.  **LTI's Motion**

    By this motion, LTI seeks an order approving its settlement

14

with all Plaintiffs in the amount of $5,000,000 (five million
dollars) as a "good faith" settlement under R.I. Gen. Laws §§ 10-
6-7 and 10-6-8.  See LTI's Motion at 1.  In support of its
contention that the settlement agreement has been reached in good
faith, LTI represents that:

> The settlement agreement reached between LTI and the
> Plaintiffs resulted from extensive negotiations between
> counsel for the parties, each in pursuit of their
> clients' interests.  These negotiations began in late
> early [sic] 2007, when counsel for LTI notified
> plaintiffs' counselors that LTI had lost its ATF license,
> that its liabilities exceeded its assets and that it was
> planning a liquidation sale.  It was impressed upon
> counsel that the only asset LTI could contribute to the
> settlement was its available insurance ($1 million from
> a Commercial general Liability Policy, and $4 million
> from an Umbrella policy, which also covered LTI's vendor,
> High Tech Special Effects, Inc.).  The plaintiffs
> requested asset confirmation, and LTI provided various
> financial records.  Ultimately, on March 15, 2007[,]
> counsel for the plaintiffs took an asset deposition of
> Amanda McLean, LTI's president, to confirm the suggestion
> that LTI had no assets beyond its available insurance
> coverage.  LTI received a written demand on behalf of all
> plaintiffs dated May 18, 2007.  The offer was accepted
> and a Notice of Settlement was filed on March 12, 2008.
> [Affidavit of Robert T. Norton ("Norton Aff.")[12]] ¶¶ 2,
> 3.[1]  In that Notice, the parties announced that the
> settlement was conditioned on (among other things) this
> Court's approval of the settlement agreement.  See Notice
> of Settlement – Luna Tech and High Tech Special Effects
> [Gray Doc. No. 1789].
>
> The negotiations leading to this settlement were
> forthright and candid, with ample give-and-take from both
> sides.  Norton Aff., ¶¶ 2, 4.  At the outset, plaintiff's
> [sic] counsel appeared skeptical about the paucity of

---

[12] The Affidavit of Robert T. Norton ("Norton Aff.") is attached
as Exhibit A to Luna Tech, Inc.'s Motion to Approve "Good Faith"
Settlement in Accordance with Rhode Island General Laws §§ 10-6-7 and
10-6-8 (Gray Doc. #2000) ("LTI's Motion").

> LTI's assets, and when the documentation provided still did not allay all concerns, plaintiffs deposed LTI's president.  Norton Aff., ¶¶ 2, 4.
>
> In the end, consummation of the settlement took months to reach and resulted from classic arm's length bargaining.  There was no collusion in the negotiation process.  Rather, the parties consistently were guided by their own (non-mutual) interests and never engaged in any tort[i]ous conduct intended to injure any non-settling party.  Moreover, nothing in the settlement agreement itself creates any injurious effect to any non-settling party.

Memorandum of Law in Support of Luna Tech, Inc.'s Motion to Approve "Good Faith" Settlement in Accordance with Rhode Island General Laws §§ 10-6-7 and 10-6-8 ("LTI's Mem.") at 4-5 (fifth alteration in original).

Based on the above representation and the information contained in the Norton Aff., I find that the agreement between LTI and Plaintiffs to settle all claims for the gross amount of $5,000,000 (five million dollars) is a non-collusive agreement which has been negotiated, bargained for, and agreed to at arm's length and in good faith.  Thus, the settlement satisfies the standard for "a judicially approved good-faith settlement" within the meaning of R.I. Gen. Laws §§ 10-6-7 and 10-6-8.  Accordingly, I recommend that LTI's Motion be granted and that any potential contribution claims against LTI be extinguished with prejudice pursuant to these statutory sections.

## 3.  Jack Russell Defendants' Motion

The Jack Russell Defendants[13] seek an order approving their settlement with all Plaintiffs in the amount of $1,000,000 (one million dollars) as a "good faith" settlement under R. I. Gen. Laws §§ 10-6-7 and 10-6-8 so as to extinguish liability for any and all future claims for contribution.  See Jack Russell Defendants' Motion at 1.  In support of the motion, the Jack Russell Defendants represent that:

> The settlement reached between Plaintiffs and [the Jack Russell Defendants] resulted from extensive negotiations between their counsel over several months, each in the diligent pursuit of their clients' interests. The negotiations culminated on September 2, 2008[,] when the Plaintiffs filed a Notice of Settlement with this Court.  *Gray* Document No. 1903.  In that Notice, Plaintiffs announced their intent to settle with [the Jack Russell Defendants], as well as Co-Defendant Biechele, conditioned on (among other things) this Court's approval of the settlement consideration of $1,000,000.00.

> The negotiations leading to this settlement were always undertaken at arms length, with all parties represented by counsel and with due consideration by the parties of all of the defenses raised by [the Jack Russell Defendants], the pendency of the motion for summary judgment filed by Defendants Kendall, Powers and Filice, the potential risks and rewards of proceeding to trial, the financial resources of [the Jack Russell Defendants], and the pressing financial needs of at least some of the Plaintiffs.  [Affidavit of Steven M. Richard

_____

[13] The Jack Russell Defendants are: Jack Russell, Jack Russell Touring, Inc., Paul Woolough, Manic Music Management, Inc., Knight Records, Inc., Mark Kendall, David Filice and Eric Powers.  See Motion to Approve Settlement by Defendants Jack Russell, Jack Russell Touring, Inc., Paul Woolough, Manic Music Management, Inc., Knight Records, Inc., Mark Kendall, David Felice and Eric Powers (Gray Doc. #2001)(Henault Doc. #1136).

("Richard Aff.")[14]] at ¶ 4.  Plaintiffs and [the Jack
Russell Defendants] did not agree to any settlement terms
intended to tortiously or wrongfully injure any non-
settling Defendants.  *Id.*  Indeed, Plaintiffs have
reached settlements in principle with all other
Defendants that in general include the same non-financial
conditions found in the agreement with [the Jack Russell
Defendants].  *Id.*  This further demonstrates that this
settlement was negotiated at arms length, and does not
wrongfully prejudice any other party to this litigation.

Memorandum of Defendants Jack Russell, Jack Russell Touring,
Inc., Paul Woolnough, Manic Music Management, Inc., Knight
Records, Inc., Mark Kendall, David Filice and Eric Powers in
Support of Their Motion to Approve Settlement ("Jack Russell
Defendants' Mem.") at 4-5.

Based on the above representation and the information
contained in the Affidavit of Steven M. Richard, I find that the
agreement between the Jack Russell Defendants and Plaintiffs to
settle all claims for the gross amount of $1,000,000 (one million
dollars) is a non-collusive agreement which has been negotiated,
bargained for, and agreed to at arm's length and in good faith.
Thus, the settlement satisfies the standard for "a judicially
approved good-faith settlement" within the meaning of R.I. Gen.
Laws §§ 10-6-7 and 10-6-8.  Accordingly, I recommend that the
Jack Russell Defendants' Motion be granted and that any potential

---

[14] The Affidavit of Steven M. Richard ("Richard Aff.") is attached
as Exhibit A to the Memorandum of Defendants Jack Russell, Jack
Russell Touring, Inc., Paul Woolnough, Manic Music Management, Inc.,
Knight Records, Inc., Mark Kendall, David Filice and Eric Powers in
Support of Their Motion to Approve Settlement ("Jack Russell
Defendants' Mem.").

contribution claims against the Jack Russell Defendants be extinguished with prejudice pursuant to these statutory sections.

## 4.   LIN Television Defendants' Motion

The LIN Television Defendants[15] seek an order approving their $30,000,000 (thirty million dollar) settlement with all Plaintiffs as a "good faith" settlement in accordance with R.I. Gen. Laws §§ 10-6-7 and 10-6-8 so as to extinguish all potential contribution claims by joint tortfeasors against the LIN Television Defendants.  See LIN Television Defendants' Motion at 1.  In support of their motion, the LIN Television Defendants represent that:

> The $30,000,000 gross settlement between the LIN Television Defendants and Plaintiffs was the result of considerable negotiations between counsel for the LIN Television Defendants, the LIN Television Defendants' insurers, and counsel for those insurers on the one hand and counsel for the Plaintiffs on the other hand.  These negotiations began on or about September 28, 2007, at which time counsel for the LIN Television Defendants received Plaintiffs' first, written, settlement demand. *See* [Declaration of Charles L. Babcock in Support of the LIN Television Defendants'[] Motion to Approve "Good Faith" Settlement Pursuant to R.I.G.L. §§ 10-6-7 and 10-6-8 ("Babcock Decl.")[16]] at para. 5.  Thereafter, on or

---

[15]  The LIN Television Defendants are Brian Butler; TVL Broadcasting, Inc.; STC Broadcasting, Inc.; LIN Television Corporation; LIN TV Corp.; and TVL Broadcasting of Rhode Island, LLC. Lin Television Defendants'[] Motion to Approve "Good Faith" Settlement Pursuant to R.I.G.L. §§ 10-6-7 and 10-6-8 (Gray Doc. #2003)(Henault Doc. #1138) ("LIN Television Defendants' Motion") at 1 n.1.

[16]  The Declaration of Charles L. Babcock in Support of the LIN Television Defendants'[] Motion to Approve "Good Faith" Settlement Pursuant to R.I.G.L. §§ 10-6-7 and 10-6-8 ("Babcock Decl.") was filed with the LIN Television Defendants' Motion.

about January 3, 2008, after approximately three months
of extensive discussions and meetings between and amongst
counsel for the LIN Television Defendants, the LIN
Television Defendants' insurers, and counsel for those
insurers, the LIN Television Defendants made a written
counteroffer to Plaintiffs. *Id.* Even though the
Plaintiffs' demand and the LIN Television Defendants'
offer were millions of dollars apart, the parties agreed
to mediate the case before Paul A. Finn of Commonwealth
Mediation and Conciliation, Inc. *Id.* at para. 6. As
such, on January 25, 2008, the Plaintiffs and the LIN
Television Defendants successfully mediated the case and
reached the aforementioned $30,000,000 gross settlement.
*Id.* at para. 6.

The $30,000,000 gross settlement reached between the
Plaintiffs and the LIN Television Defendants was the
result of non-collusive, arm's length negotiating, which
resulted in a good faith settlement. *Id.* at para. 8 and
9. Moreover, the negotiation process and conduct of the
Plaintiffs and the LIN Television Defendants in reaching
the above-referenced settlement was not injurious or
prejudicial towards any non-settling defendant. *Id.* at
para. 9.

LIN Television Defendants'[ ] Memorandum of Law in Support of

Their Motion to Approve "Good Faith" Settlement Pursuant to

R.I.G.L. §§ 10-6-7 and 10-6-8 ("LIN Television Defendants' Mem.")

at 3-4.

Based on the above representation and the information

contained in the Babcock Decl., I find that the agreement between

the LIN Television Defendants and Plaintiffs to settle all claims

for the gross amount of $30,000,000 (thirty million dollars) is a

non-collusive agreement which has been negotiated, bargained for,

and agreed to at arm's length and in good faith. Thus, the

settlement satisfies the standard for "a judicially approved

good-faith settlement" within the meaning of R.I. Gen. Laws §§

10-6-7 and 10-6-8.  Accordingly, I recommend that the LIN Television Defendants' Motion be granted and that any potential contribution claims against the LIN Television Defendants be extinguished with prejudice pursuant to these statutory sections.

5.  **Biechele's Motion**

Defendant Daniel Biechele ("Biechele") seeks an order approving his $1,000,000 (one million dollar) settlement with all Plaintiffs as a "good faith" settlement in accordance with R. I. Gen. Laws §§ 10-6-7 and 10-6-8 so as to extinguish all potential contribution claims by other Defendants against him.  <u>See</u> Biechele's Motion at 1; <u>see also</u> Memorandum in Support of Motion to Approve Settlement by Defendant Daniel Biechele ("Biechele's Mem.") at 1, 4.  In support of his motion, Biechele represents that:

> The Gray Plaintiffs have alleged negligence claims and violations of R.I.G.L. [§] 9-1-2 against Defendant Daniel Biechele.  Gray Plaintiffs' Third Amended Complaint, [<u>Gray</u>] Document No. 695 at Counts XXIV, XXV and XXVI.  The Henault Plaintiffs have alleged additional negligence claims and joint venture claims against Defendant Daniel Biechele.  Henault Plaintiffs' Notice of Adoption of First Amended Complaint, Henault Document No. 188 at Count X.

> [The Jack Russell Defendants] and Defendant Biechele were covered as "insureds" under one policy of insurance in the amount of $1 million issued by St. Paul Fire & Marine Insurance Company ("St. Paul").[17]

---

[17] A footnote appearing in the text at this point states:

Defendant Daniel Biechele ("Biechele") and the [Jack Russell

21

Attorney Steven M. Richard, who represents the [Jack Russell Defendants], had numerous discussions with Plaintiffs' counsel regarding settlement. Defendant Biechele's counsel monitored and was kept apprised of these negotiations. These settlement discussions resulted in an agreed settlement amount of $1 million. Due to the fact that the [Jack Russell Defendants] and defendant Biechele were all covered under the same $1,000,000.00 policy of insurance, the settlement also included Defendant Biechele.[18]   *See Affidavit of Steven M. Richard and Memorandum to approve settlement filed by Steven M. Richard on behalf of the Band Defendants,[19] [Gray] Document Nos. 1136 and 1136-2.*

Memorandum in Support of Motion to Approve Settlement by Defendant Daniel Biechele ("Biechele Mem.") at 1-2.

Defendant Biechele further represents that:

On September 2, 2008, Plaintiffs filed a Notice of Settlement with the Court, Gray Document No. 1903. In said Notice, the Plaintiffs announced their intent to settle with the [Jack Russell Defendants] as well as Defendant Biechele conditioned on (among other things),

---

Defendants] are named insureds under a policy of insurance in the amount of $1 million issued by St. Paul Fire & Marine Insurance Company ("St. Paul"). On August 16, 2006, St. Paul filed a Complaint in Interpleader in this Court against claimants making or [who] may make adverse claims under the policy for injuries and death sustained in connection with the fire on February 20, 2003[,] at the Station. *See C.A. No. 06-370-L.* On August 17, 2006, this Court entered an Order Directing Deposit of Stake, whereby St. Paul was ordered to deliver $1 million to the Clerk of this Court for deposit in a Money Market Account. St. Paul delivered the payment in accordance with the Court's Order.

Memorandum in Support of Motion to Approve Settlement by Defendant Daniel Biechele ("Biechele Mem.") at 2 n.1.

[18] A footnote appearing in the text at this point notes: "The Notice of Settlement states Plaintiffs' intention to resolve and settle all their claims against the [Jack Russell Defendants] and Daniel Biechele." Id. at 2 n.2.

[19] The "Band Defendants" are the Jack Russell Defendants.

this Court's approval of the settlement consideration of $1 million.

As indicated in the Memorandum and [A]ffidavit filed by Attorney Richard[,] the negotiations with Plaintiffs' counsel were undertaken at arm's length.  The Plaintiffs and defendant Biechele did not agree to any settlement terms intended to tort[i]ously or wrongfully injure any non-settling defendants.

Id. at 4.

In further support of his motion, Defendant Biechele has

submitted an affidavit from one of his attorneys, Donald J.

Maroney, which states:

1.  James H. Reilly and I have been counsel of record for Defendant Daniel Biechele throughout the litigation of the claims pending before this Court arising out of the February 20, 2003[,] fire at The Station nightclub.

2.  Mr. Biechele was the band manager for the group, Great White.

3.  Defendants Jack Russell, Jack Russell Touring, Paul Woolnough, Manic Music Management, Inc., Knight Records, Inc.[,] Mark Kendall, David Filice, Eric Powers (hereinafter referred to as "Band Defendants") and Mr. Biechele were all covered under one policy of insurance in the amount of $1 million.

4.  The settlement is subject to approval by all Plaintiffs, execut[ion] of [a] mutually acceptable release by all Plaintiffs and approval of the settlement by the Court and the successful defense of any challenge to the constitutionality of the Rhode Island Uniform Contribut[ion] Among Joint Tortfeasors Act (R.I. General Law[s] § 10-6-1 et seq[.]) as amended in 2006.

5.  The settlement is the result of an arm's length transaction between Plaintiffs' counsel and Attorney Maroney.

6.  That I had spoken with Plaintiffs' counsel and Plaintiffs' counsel has confirmed that the $1 million policy issued by St. Paul Fire & Marine Insurance Company

23

covered Daniel Biechele and all the "Band Defendants" and that settlement with the Band Defendants would also settle all claims against Mr. Biechele.

7.   That this settlement was the result of an arm's length transaction and involved neither collusi[ve] conduct nor any intent to injure any non-settling party or anyone else.

8.   There are no additional side agreements, deals or consideration with respect to Mr. Biechele on the one hand, and the Plaintiffs, their agents or representatives on the other.

Affidavit of Donald J. Maroney in Support of Motion to Approve Settlement in Accordance with R.I.G.L. §§10-6-7, 10-6-8 on Behalf of Defendant Daniel Biechele ("Maroney Aff.").

Based on the above representations, I find that the agreement between Defendant Biechele and Plaintiffs to settle all claims for the gross amount of $1,000,000 (one million dollars)[20] is a non-collusive agreement which has been negotiated, bargained for, and agreed to at arm's length and in good faith.  Thus, the settlement satisfies the standard for "a judicially approved good-faith settlement" within the meaning of R.I. Gen. Laws §§ 10-6-7 and 10-6-8.  Accordingly, I recommend that Defendant Biechele's Motion be granted and that any potential contribution claims against Defendant Biechele be extinguished with prejudice pursuant to these statutory sections.

---

[20] As explained in the Maroney Aff., because the Jack Russell Defendants and Defendant Biechele were all covered under one policy of insurance in the amount of $1 million, Maroney Aff. ¶ 3, this one million dollars is the same million dollars which constitutes the consideration for the settlement with the Jack Russell Defendants, see id. ¶ 6, see also Biechele's Motion at 1 n.1.

24

**6.   DERCO Defendants' Motion**

Defendants Jeffrey Derderian, Michael Derderian, and DERCO, LLC ("DERCO Defendants"), seek approval of their settlement with Plaintiffs in the amount of $813,218.82, plus or minus, from the DERCO Defendants' bankruptcy estates, less such sums as are allowed as administrative costs of the Bankruptcy Estates of the DERCO Defendants, as a "good faith" settlement under R.I. Gen. Laws §§ 10-6-7 and 10-6-8 so as to extinguish liability for any and all future claims for contribution.  See DERCO Defendants' Motion at 1; see also Memorandum in Support of Motion of the Defendants, Jeffrey Derderian, Michael Derderian, and DERCO, LLC, to Approve the Settlement ("DERCO Defendants' Mem.") at 2.  In support of the motion, the DERCO Defendants represent that:

> On or about September 23, 2005[,] the Defendants filed for bankruptcy protection pursuant to the Chapter 7 provisions of 11 U.S.C. 1101 et seq.
>
> Stacy B. Ferrara is the duly appointed Trustee of the Bankruptcy Estates.
>
> The Defendants, at the time of the aforementioned fire at the Station Nightclub, held a policy of insurance ("Policy") issued by Essex Insurance Company ("Essex") insuring them for liability arising from the operation of the Station Nightclub.  The indemnity limit of liability of the Essex Insurance Policy is $1 million.
>
> Essex has paid $186,781.18 on account of medical bills of the victims of the Station fire, pursuant to the terms of the medical payments provisions of the Essex Policy.
>
> Prior to the filing of said bankruptcy petitions, and from time to time, Attorneys Mark Mandell and Max Wistow discussed settlement of the Plaintiffs' claims

with Attorney Anthony F. DeMarco.  Since the filing of
the petitions in bankruptcy, and pursuant to discussions
with the Trustee's representatives and with Attorney
Anthony F. DeMarco, the Plaintiffs have reached a
settlement with the Trustee which provides that the total
net assets of the Bankruptcy Estates, more or less (the
proceeds from the Essex Insurance policy minus the
administration costs of the bankruptcy estate), will be
paid to such entity as may be designated by the Court or
counsel for the Plaintiffs, in exchange for a release of
all claims that the Plaintiffs have, or may have in the
future, against the Defendants or against the Bankruptcy
Estates.  The Trustee's settlement of her claims against
Essex are subject to the approval of the United States
Bankruptcy Court.

The settlement reached between the parties was
negotiated at arm's length and in "good faith."[21]

DERCO Defendants' Mem. at 1-2.

Based on the above representations, I find that the
agreement between the DERCO Defendants and Plaintiffs to settle
all claims for $813,218.82, plus or minus, from the DERCO
Defendants' bankruptcy estates, less such sums as are allowed as
administrative costs of the Bankruptcy Estates of the DERCO
Defendants, is a non-collusive agreement which has been
negotiated, bargained for, and agreed to at arm's length and in
good faith.  Thus, the settlement satisfies the standard for "a
judicially approved good-faith settlement" within the meaning of
R.I. Gen. Laws §§ 10-6-7 and 10-6-8.  Accordingly, I recommend

---

[21] A footnote appearing in the text at this point states: "The
settlement is akin to the settlement of a direct action suit by the
Plaintiffs against Essex Insurance Company for the balance of the
Policy proceeds."  Memorandum in Support of Motion of the Defendants,
Jeffrey Derderian, Michael Derderian, and DERCO, LLC, to Approve the
Settlement ("DERCO Defendants' Mem.") at 2 n.1.

that the DERCO Defendants' Motion be granted and that any potential contribution claims against the DERCO Defendants be extinguished with prejudice pursuant to these statutory sections.

## 7.  **High Tech's Motion**

By this motion, Defendant High Tech Special Effects, Inc. ("High Tech"), seeks an order approving its settlement with all Plaintiffs in the amount of $1,000,000 (one million dollars) as a "good faith" settlement pursuant to R.I. Gen. Laws §§ 10-6-7 and 10-6-8.  See High Tech's Motion at 1.  In support of its contention that the settlement agreement has been reached in good faith, High Tech represents that:

> High Tech, a Tennessee corporation, was the distributor[22] of the pyrotechnic products known as "gerbs"[23] which were ultimately used during the Station Night Club concert on February 20, 2003.  The plaintiffs in both actions allege general negligence and strict products liability claims against High Tech as distributor of the pyrotechnics used by the band, Great White, on the night of the fire.
>
> Settlement negotiations commenced in early 2007, when counsel for High Tech communicated to plaintiffs' counsel that the only asset the company could contribute to a settlement was its available insurance limits ($1

---

[22] "Co-defendant, Luna Tech, Inc. ("LTI"), was the manufacturer of the pyrotechnics distributed by High Tech."  Memorandum of Law in Support of Defendant, High Tech Special Effects, Inc.'s Motion to Approve "Good Faith" Settlement under R.I.G.L. §§ 10-6-7 and 10-6-8 ("High Tech's Mem.") at 2 n.1.

[23] "'Gerbs' is a professional term within the pyrotechnic industry which refers to those fireworks which produce a spray of bright sparks in a fountain-style effect.  Gerbs placed in an upward facing position create a 'spray' effect whereas gerbs in a downward-facing position create a 'waterfall' effect."  High Tech's Mem. at 2 n.2.

million from a Commercial General Liability Policy).  In
March 2007, the plaintiffs' counsel obtained a sworn
recorded statement from High Tech's principal, Randy
Bast, regarding the corporation's financial assets.  The
plaintiffs' counsel also commenced a similar inquiry in
order to verify the financial assets of co-defendant,
Luna Tech, Inc., the manufacturer of the pyrotechnics
distributed by High Tech.  On May 18, 2007, after
confirming High Tech's assets and reviewing its financial
records, plaintiffs' counsel submitted a written
settlement demand to both High Tech and Luna Tech,
Inc.[,] in the total amount of $6,000,000.00 (six million
dollars).  Over the next several weeks, counsel for
plaintiffs, Luna Tech, and High Tech engaged in a series
of negotiations in a sincere attempt to arrive at a
mutually agreeable resolution of all claims in
furtherance of the best interests of their respective
clients.  The merits of the plaintiffs' claims, the
viability of High Tech's defenses, the limits of High
Tech's liability insurance coverage, the absence of other
applicable insurance, and the necessity of protecting
High Tech from potential exposure to judgments in excess
of its available coverage were among the animating themes
of these negotiations.

        In a letter dated June 20, 2007, both High Tech and
Luna Tech accepted the plaintiffs' settlement demand and
advised that High Tech's settlement contribution would be
in the amount of $1,000,000.00—the limits of its
Commercial General Liability (CGL) policy.  Similarly,
Luna Tech's contribution of $5,000,000.00 exhausted the
respective limits of both its CGL and Umbrella[24]
policies.  Plaintiffs, High Tech and Luna Tech have filed
a Notice of Settlement with the Court which memorializes
this settlement in principle.  The settlement is
expressly subject to (1) the approval of all Plaintiffs;
(2) execution of mutually acceptable settlement and
release agreements by all Plaintiffs, which shall include
satisfactory release and indemnity language preserving
Plaintiffs' claims against the remaining non-settling
Defendants, and protecting High Tech against cross-claims

---

[24] A footnote which appears in the text at this point states:
"Luna Tech, Inc.'s Umbrella Policy carried limits of $4 million and
afforded coverage to High Tech as vendor.  A settlement in principle
has been reached between Luna Tech, Inc. and plaintiffs' counsel for
the policy limits."  High Tech's Mem. at 3 n.3.

from any other Defendant; (3) approval of the settlement
by the Court; (4) approval by the Court of the allocation
plan developed by the Special Master; and (5) successful
defense of any constitutional challenge by any non-
settling party to the Rhode Island Uniform Contribution
Among Tortfeasors Act (R.I.G.L. §10-6-1, *et seq.*), as
amended.

Memorandum of Law in Support of Defendant, High Tech Special

Effects, Inc.'s Motion to Approve "Good Faith" Settlement under

R.I.G.L. §§ 10-6-7 and 10-6-8 ("High Tech's Mem.") at 2-4.

High Tech further represents that:

[T]here is no evidence of anything other than good
faith conduct by High Tech and the Plaintiffs.[ ]   The
negotiations were not in any way collusive and the terms
of settlement are not injurious to any non-settling
parties.   Rather, the settlement agreement reached
between High Tech and the Plaintiffs was the result of
quintessential arm's length bargaining in which counsel
entered into serious and extensive negotiations and
ultimately thrashed out acceptable terms for resolving
all claims after careful consideration of the best
interests of their respective clients.

The gross settlement of $1 million reflects the
monetary value the parties ascribed to the pretrial
disposition of this case after weighing the risks and
benefits of proceeding to trial, the evidence in support
of the claims and defenses asserted by the parties, and
the availability of insurance coverage and non-insurance
assets to satisfy any judgments in the event of a trial.
In sum, this settlement was the consummate product of
thoughtful, honest, diligent and spirited negotiations
which were rooted in the merits of the case and the
legitimate rights and interests of the litigants
involved.

Id. at 6.

Based on the above representation and the information

contained in the Affidavit of Mark T. Nugent ("Nugent Aff."),[25] I find that the agreement between High Tech and Plaintiffs to settle all claims for the gross amount of $1,000,000 (one million dollars) is a non-collusive agreement which has been negotiated, bargained for, and agreed to at arm's length and in good faith. Thus, the settlement satisfies the standard for "a judicially approved good-faith settlement" within the meaning of R.I. Gen. Laws §§ 10-6-7 and 10-6-8.  Accordingly, I recommend that High Tech's Motion be granted and that any potential contribution claims against High Tech be extinguished with prejudice pursuant to these statutory sections.

### Summary

All the Movants have satisfied their initial burden of establishing that a settlement has been agreed upon and the nature and terms of the settlement.  No party has objected to any of the Motions, and no party raised a legitimate issue of good faith with respect to any settlements.  Based upon the representations made by the Movants in their supporting memoranda and also in the affidavits filed in support of the Motions, I find that each settlement is a non-collusive agreement which has been negotiated, bargained for, and agreed to at arm's length and in good faith.  Thus, each settlement satisfies the standard for

---

[25] The Affidavit of Mark T. Nugent ("Nugent Aff.") is attached as Exhibit A to High Tech's Motion.

"a judicially approved good-faith settlement" within the meaning of R.I. Gen. Laws §§ 10-6-7, 10-6-8.  Accordingly, I recommend that the Motions be granted and that any potential contribution claims against the Movants be extinguished with prejudice pursuant to these statutory sections.

## Conclusion

For the reasons stated above, I recommend that the Motions be granted.  Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10)[26] days of its receipt.  <u>See</u> Fed. R. Civ. P. 72(b); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. <u>See</u> <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).


/s/ David L. Martin
DAVID L. MARTIN
United States Magistrate Judge
August 14, 2009

---

[26] The ten days do not include intermediate Saturdays, Sundays, and legal holidays.  <u>See</u> Fed. R. Civ. P. 6(a).